James B. Lowell, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

James Russell Lowell, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 68048, 68049.   Promulgated July 27, 1934.

*Adrian C. Humphreys, Esq.,* for the petitioners.
*George D. Brabson, Esq.,* for the respondent.

1298

OPINION.

ARUNDELL: Briefly restating the facts in the case of James B. Lowell, it appears that he was a specialist in three stocks on the New York Stock Exchange. He owned other securities, which were hypothecated as collateral for his marginal account. He inventoried both groups of securities at cost or market, whichever was lower. He entered a partnership in March of 1929 with the other petitioner and continued specializing in the same stocks as theretofore. The partnership had no opening inventory and its closing inventory consisted entirely of two of the stocks specialized in, which it inventoried at market in determining income for 1929. The respondent has denied to both the individual and the partnership the right to inventory their securitites for the purpose of determining income.

Petitioners claim the right to inventory securities on the ground that they were dealers therein within the meaning of article 105 of

Regulations 74. That article, in so far as material here, provides as follows:

\* \* \* For the purpose of this rule a dealer in securities is a merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom. \* \* \*

In *Northeastern Surety Co.*, 29 B.T.A. 297, we approved the above article as being " reasonable, and designed to carry out fairly the terms and intent of the statute."

The securities here involved should, we think, be divided into two groups. First, those used by petitioner James B. Lowell as collateral for his margin account, and, second, those in which the petitioner was a specialist. In the first group, according to the schedules in evidence, were about forty different securities at the beginning and also at the close of the year. There were some changes during the year, but in the main petitioner had the same securities at the beginning and at the end of the year. These, petitioner James B. Lowell testified he had accumulated over a period of years and were " all stocks that were bought for investment." An investor in securities is not a merchant and does not come within the definition of the regulations above quoted. See *Adirondack Securities Corp.*, 23 B.T.A. 61; *Northeastern Surety Co., supra; Donander Co.*, 29 B.T.A. 312; *Oil Shares, Inc.*, 29 B.T.A. 664. In view of petitioner's testimony as to the purpose for which he purchased the securities under consideration, it seems beyond serious question that as to them he cannot be classified as a dealer. Those securities constituted his capital, and capital may not be inventoried for purposes of determining income from sales.

The other group consists of those stocks dealt in as specialties. Some of the transactions in these stocks consisted of matching purchase orders against sales orders, the orders on both sides of the book being received from brokers, and for this service a commission was paid by the brokers. It is obvious that in such transactions no securities would need be carried in stock if the buy and sell orders matched up evenly each day. To what extent they were even is not shown, but the testimony of petitioner James B. Lowell is that he endeavored to come out as nearly even as possible. Transactions of this kind in our opinion cannot be classified as the " purchase of securities and their resale to customers." Art. 105, Regulations 74. The petitioner in such cases was not selling securities previously purchased, but was rather acting as a broker on a commission basis.

A dealer or merchant gains or loses directly in proportion to fluctuations in the market price of the commodity in which he deals; not so with petitioners in their matching operations, for no matter how much the spread in prices their commission was the same on each 100-share lot cleared on their books.

The other transactions in the specialty stocks were not such as to come within the generally accepted understanding of the terms of merchant or dealer. They were purchases or sales, sometimes short sales, made when there were no matching orders on the books. These transactions, according to the testimony, were for the purpose of creating or maintaining a market; they were speculative, as explained by the witness, in that he was betting on a rise or fall in the market according to whether he was long or short of the stock. An effort was made to even up on each transaction within the day though this was not always accomplished. These transactions were engaged in to maintain the market only for the day; they were engaged in on margin with Wrenn Brothers; no certificates were issued in the names of petitioners or the partnership; and neither the petitioners nor their partnership could deal directly with the public. These matters demonstrate the width of the gap between the petitioners and a dealer or merchant, who is generally understood to be one who carries a stock of his wares and stands ready to deal directly with all who wish to trade in that commodity. We are accordingly of the opinion, and so hold, that petitioners were not dealers in the stock in which they were specialists.

These cases are distinguishable from that of *Estate of Harry E. R. Hall*, 29 B.T.A. 1255. In that case the petitioner's decedent was a member of a partnership which had an established place of business at which it dealt in securities. The partnership specialized in the stock of one corporation, the New York Dock Co., and we found as a fact that the stock of that corporation was not purchased either for investment or speculation, but for future resale at a profit. The purchasers of the stock were mostly, but not entirely, members of the New York Stock Exchange, and on resales to them the partnership dealt with them as principals and customers. At the close of each year involved in that case the partnership had on hand substantial amounts of the stock. In the opinion in that case we distinguished it from *Donander Co.* and *Oil Shares, Inc., supra*, in the following language, which also aptly points out some of the distinctions between it and the present case:

In each of the cited cases we found that the petitioner was not a dealer, but was engaged primarily in investing or speculating as opposed to merchandizing securities. An entirely different situation is presented in the

case at bar. The partnership with which we are concerned here is clearly shown by the evidence to have dealt in the stocks involved primarily as a merchant. While it purchased *through* brokers who were members of the stock exchange and sold to brokers as *principals or customers*, it held itself out as a merchant of securities and the transactions were cleared through its own office, not those of the brokers. It also purchased from and sold to others than brokers. We know of no good reason why a broker, even though acting for an undisclosed client, should not properly be regarded as a *customer* in the making of repeated purchases of securities and held for resale by the partnership.

The remaining question is that of deductions claimed as expenses and disallowed by the respondent on the ground that they were capital expenditures. The evidence is uncontradicted that the amounts paid were levied by the exchange on its members and they were obligated to pay as a condition to doing business on the floor of the exchange. The assessments for the most part were for the purpose of meeting operating expenses and as such are clearly allowable as expense deductions. Respondent's only serious objection to the claim is that part of the amount paid went to a gratuity fund out of which a certain sum was paid to the widow or children of deceased members. Payments going to this fund, the respondent argues, were in the nature of insurance premiums. The evidence as to the method of operation of the gratuity fund is rather unsatisfactory. We have nothing on this except the testimony of one of the petitioners who described the fund and the method of administration in general terms. Whether assessments were levied on living members and the whole sum paid out to the family of a deceased member, or whether a fund was accumulated so that the family of a deceased member benefited from payments made during his life, is not shown. It may be that the rules of the exchange describe the method of operation, but they were not placed in evidence. We accordingly hold that the amounts paid into the gratuity fund cannot be allowed as deductions on the showing made. The evidence is not entirely clear as to who claimed deductions for the payments made to the gratuity fund aggregating $135.33, but, as the payments were made by petitioners after formation of the partnership, we assume that the total was included in the deductions claimed by the partnership, and we hold that the respondent properly disallowed that much of the partnership deduction.

*Decision will be entered under Rule 50.*