The People of the State of New York ex rel. Temple T. Berdan, Respondent, v. Henry M. Goldfogle and Others, as Commissioners of Taxes and Assessments of the City of New York, Appellants. (Moneyed Capital Taxes of 1923.)

First Department, July 6, 1925.

**Taxation — tax on moneyed capital coming into competition with business of National banks — money invested in stock brokerage concern engaged in " odd lot " and " specialist " business and buying and selling for its own account not taxable.**

Money invested by the relator in a stock brokerage concern which is engaged in the " odd lot " and " specialist " business on the Stock Exchange, and also in buying and selling stocks and bonds for its own account, does not come into competition with the business of National banks and cannot be taxed on that basis.

Appeal by the defendants, Henry M. Goldfogle and others, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 31st day of December, 1924, in certiorari proceedings brought to review assessments on property of the relator, under the Laws of 1923, chapter 897, amending the Tax Law and known as the Moneyed Capital Tax Law, directing that the assessment of $140,000 made by the defendants for the purposes of taxation for the year 1923, against the relator on the value of moneyed capital owned or held by the relator coming into competition with the business of National banks, be vacated and canceled.

The opinion of the Special Term is reported *sub nom. People ex rel. Broderick* v. *Goldfogle* (123 Misc. 399).

*George P. Nicholson, Corporation Counsel* [*William H. King* of counsel; *Eugene Fay* with him on the brief]; for the appellants.

*Lord, Day & Lord* [*John W. Davis* and *Franklin B. Lord* of counsel; *Sherman Baldwin* with them on the brief], for the respondent.

DOWLING, J.:

The relator, a resident of New York, is a member of the firm of Vernon C. Brown & Co., with offices at No. 74 Broadway in the city of New York. It is a Stock Exchange house principally engaged in two branches of the stock brokerage business, one being the " odd lot " business and the other the " specialist " business.

It also carried on its books a small number of accounts of individuals who purchased and sold stocks through the firm.

The " odd lot " business comprises the purchase and sale of stocks in units of 100 shares and the sale and purchase of such stocks in smaller quantities. The " odd lot " business exists because of a rule of the New York Stock Exchange which makes the unit of trading on the floor of the Exchange 100 shares of stock or $10,000 in bonds. Any number of shares or bonds less than these units are called " odd lots."

The business of an odd lot dealer consists in buying or selling any amount of stock from one share to ninety-nine shares, equalizing his position in the market by continually purchasing or selling large amounts of stock in " board lots " (one hundred shares or more) as the necessities of the odd lot position require.

Stock Exchange houses dealing in " odd lots " become known as " odd lot " houses. Such houses in this class of transactions act entirely as principals, never charging commissions or brokerage.

In a bad market selling orders come from all directions, occasionally aggregating in their total a large amount of stock. This stock must be taken by the odd lot broker, even though he feels the market is going down, if he wishes to retain his business. The conditions which bring about large sales in odd lots by other brokers make it difficult for the odd lot house to sell in the open market in board lots the odd lots which they have been obliged to buy and it is sometimes necessary to carry over some of the stock until it can be worked off in the open market.

On the other hand, in a booming market, there are many orders for the purchase of odd lots, and the odd lot house, if it desires to maintain its position against its competitors and to be able to fill orders from other brokers at satisfactory prices, must " lay in a stock." This necessitates the odd lot house going into the open market and buying stocks in board lots.

Under normal conditions an odd lot house preserves an

First Department, July, 1925. [Vol. 213

equilibrium by buying or selling board lots to offset the sales or purchases of odd lots, so that at the end of the day the firm is even.

The " specialist " business comprises dealing in a limited group of stocks. The " specialist " is a floor broker who undertakes to specialize in a limited group of stocks, and a firm conducting a " specialist " business is one which is represented by one or more such floor brokers.

For the convenience of brokers and to expedite the execution of orders, all the stocks listed on the Stock Exchange are grouped around different " posts " located on the floor. A broker receiving an order to buy or sell knows exactly to which post he must go to find his market. It is impossible for a broker simultaneously to watch a number of orders in stocks located at posts distant from one another so that each order may be executed when the broker's price limit is reached. Such an attempt would inevitably lead to the broker frequently missing his market. The " specialist " business has been developed to take care of this situation. The specialist stations himself at one of the posts on the floor where he remains from ten A. M. to three P. M. accepting orders coming from other Stock Exchange members in the stocks listed at his post. He is always at his post and the orders he receives are usually those impossible of execution at the time they are given out but which come into force as the market advances or declines. The necessity for specialists arises from the rigid responsibility to which Stock Exchange members are held for the execution of orders when market conditions permit. At times great loss would result to brokers doing business around the room unless they could pass this responsibility on to the specialist.

When a specialist accepts an order from another member he assumes responsibilities and liabilities which are recognized and ruled upon by the governors of the Exchange under the rules of the Exchange. In some cases the specialist, when he buys and sells for a Stock Exchange house, " gives up " on a transaction, *i. e.,* discloses the name of his principal. These transactions are cleared and settled by the Stock Exchange firms for whom the purchases or sales are made, and the specialist neither makes payment for the securities bought nor receives payment for the securities sold. He remains liable as a principal, however, to the party to whom he sold or from whom he bought until the due date of the settlement of the contract, although he takes no further part in the handling of the details pending the closing of the contract. He is responsible for the carrying out of the contract. In many cases the specialist does not disclose the name of his principal but gives either his own name or the name of the firm with which he is

associated, in which case his liability remains as above.    In a few cases a specialist may avoid liability where he specifically states at the time of the purchase or sale that he is buying or selling for the account of some other broker.    The other broker then becomes liable and the specialist steps out.    Such a case is exceptional; as a general rule the specialist remains liable.

In case a specialist has an order to buy a certain stock and the stock sells below the price which he is authorized to offer, he is responsible for the stock to every purchaser on his books whose offer is greater than the price at which the stock sold.    The reason for this is that, if he had executed the order, the stock would never have sold at the price below that which he was authorized to offer, at least until after the specialist's order was filled.    Where the specialist has an order to sell stock and another sale is made above the price which he is authorized to take, the specialist is also liable for the loss occasioned by his failure to act.    In some cases where there is a single sale at a figure below the amount which the specialist is authorized to offer, the specialist is liable only for the first order on his book, that is, where the specialist's orders call for the purchase of 1,000 shares and only 100 shares are sold below the authorized figure, the specialist is liable for 100 shares only.    This limitation in liability also applies to purchases.

The specialist who executes orders received from other members of the Stock Exchange receives a certain proportion of the commission paid to the other Stock Exchange members by their customers.    For instance, where stock has a par value of one hundred dollars, the broker's commission is fifteen dollars per hundred shares.    Of this fifteen dollars, the specialist receives two dollars and fifty cents.

The firm also buys and sells stocks for its own account, some purchases being made for the purpose of the odd lot business, others for speculation in the hope of a rise in their selling price.

The only accounts it carries on its books are those of the wife, sister-in-law and physician of Vernon C. Brown and the wife of F. A. Wellman, both members of the firm.    These were purely personal accommodations and not ordinary business transactions.

Neither capital invested in any of the foregoing items, nor in any other of the firm's minor items of account, was in competition with the business of National banks, and, therefore, the learned court at Special Term properly vacated and annulled the assessment.

The order appealed from should be affirmed, with ten dollars costs and disbursements.

CLARKE, P. J., FINCH, McAVOY and MARTIN, JJ., concur.

Order affirmed, with ten dollars costs and disbursements.