ALBERT FRIED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BENJAMIN EINHORN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 73876, 73877.   Promulgated November 21, 1934.

*Israel M. Pogash, C. P. A.*, for the petitioners.

*H. F. Morton, Esq., Thomas N. Mather, Esq.*, and *John T. Koehler, Esq.*, for the respondent.

## OPINION.

ARUNDELL: Petitioners concede that the firm of which they are members is not a dealer as to the stocks other than those in which it specializes. They claim that the firm is a " dealer in securities " as to the 13 specialty stocks within the meaning of article 105, Regulations 74, and consequently may inventory those stocks in computing income.

In a consideration of cases involving the question presented here it should be remembered that the taxing statute deals primarily with

realized gains or losses. *Lucas* v. *American Code Co.*, 280 U. S. 445. In order for a taxpayer to use some other method of computing gain or loss he must show clearly that he comes within statutory provisions which allow a departure from the fundamental aim of the statute. If a departure is permissible here it is under section 22 (c) of the Revenue Act of 1928, reading as follows:

Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

The application of this section is, by its language, confined to rather narrow limits. It does not extend to all cases in which taxpayers think that income can be reflected on an inventory basis. Only in the class of cases where *in the opinion of the Commissioner* the use of inventories is necessary can the inventory method be used. We have heretofore had occasion to say that the inventory method of computing income "has always been regarded as special and as involving problems of general administration peculiarly cognizable by the Commissioner." *Alfred E. Hamill*, 30 B. T. A. 955. In that case, after quoting the statute as set out above, we further said:

Fortified with such a clear sanction in the statutory grant of power, the administrative determination in such a case must survive all but the strongest attack. Short of being arbitrary or capricious or based on a clear demonstration of error, the determination in any single instance ought not to be disturbed. This is not a matter of jurisdiction, for the Board clearly has the power of review, *Blair* v. *Oesterlein Machine Co.*, 275 U. S. 220, but is rather an attitude of the Board in the exercise of its jurisdiction not to interfere lightly with general administrative matters which the Congress has entrusted to the Commissioner's discretion. * * *

The question ultimately presented for decision here is whether the petitioners have made a strong enough case to show that the respondent erred in refusing to classify the firm as a dealer. The burden of so doing, we said in the *Hamill* case, is " undoubtedly heavier than that of overthrowing a purely factual determination upon which the ultimate determination must stand."

Petitioners say that their firm is a dealer within the following definition contained in article 105:

* * * For the purpose of this rule a dealer in securities is a merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom.

In the case of *James B. Lowell*, 30 B. T. A. 1296, we had before us a specialist in three stocks traded in on the New York Stock Exchange. In our opinion in that case we said in part:

Some of the transactions in these stocks consisted of matching purchase orders against sales orders, the orders on both sides of the book being received from brokers, and for this service a commission was paid by the brokers. It is obvious that in such transactions no securities would need be carried in stock if the buy and sell orders matched up evenly each day. To what extent they were even is not shown, but the testimony of petitioner James B. Lowell is that he endeavored to come out as nearly even as possible. Transactions of this kind in our opinion cannot be classified as the "purchase of securities and their resale to customers." Art. 105, Regulations 74. The petitioner in such cases was not selling securities previously purchased, but was rather acting as a broker on a commission basis. A dealer or merchant gains or loses directly in proportion to fluctuations in the market price of the commodity in which he deals; not so with petitioners in their matching operations, for no matter how much the spread in prices their commission was the same on each 100-share lot cleared on their books.

The other transactions in the specialty stocks were not such as to come within the generally accepted understanding of the terms of merchant or dealer. They were purchases or sales, sometimes short sales, made when there were no matching orders on the books. These transactions, according to the testimony, were for the purpose of creating or maintaining a market; they were speculative, as explained by the witness, in that he was betting on a rise or fall in the market according to whether he was long or short of the stock. An effort was made to even up on each transaction within the day though this was not always accomplished. These transactions were engaged in to maintain the market only for the day; they were engaged in on margin with Wrenn Brothers; no certificates were issued in the names of petitioners or the partnership; and neither the petitioners nor their partnership could deal directly with the public. These matters demonstrate the width of the gap between the petitioners and a dealer or merchant, who is generally understood to be one who carries a stock of his wares and stands ready to deal directly with all who wish to trade in that commodity. * * *

The essentials in the *Lowell* case and these are the same, and what we said in the former case controls our decision here. The facts in the instant cases were stipulated and the stipulation omits some of the detailed evidence presented in the *Lowell* case as to the operating methods of specialists on the stock exchange. But this lack of evidence may not be availed of by petitioners, for on them rests the burden of overcoming the prima facie correctness of the respondent's determination. Their claim is that the activities of the firm as a specialist bring it within the definition of a dealer, without describing the operating methods of the specialist or even explaining the specialist's function. When we refer to the reported cases, the descriptions given of the activities and operating methods of specialists fall far short of bringing them within the meaning of "dealers" as

defined by article 105. See *James B. Lowell, supra; People* v. *Goldfogle*, 213 App. Div. 702; 211 N. Y. S. 107.[1]

Referring to some of the confused facts stipulated, it is set forth in the stipulation that the firm always had on hand some of the securities in which it specialized. · This, standing alone, is incomplete and possibly misleading, for it is a matter of general knowledge and is indicated by the cases above that it is neither the function nor aim of a specialist to carry on hand at all times a sufficiently large stock of his specialty stocks to meet all demands. His ability to supply the demand depends largely on his ability to match orders rather than upon the quantity of stock on hand. Again, there is a reference in the stipulation to the firm's buying and selling " for its own account." The statement is not explained. If such transactions were for investment or speculation they are outside the activities of a dealer. See *Adirondack Securities Corporation*, 23 B. T. A. 61; *Northeastern Surety Co.*, 29 B. T. A. 297. Moreover, under the rules of the stock exchange, a member while acting as broker, whether specialist or otherwise, is prohibited, with certain specified

---

[1] [*People* v. *Goldfogle, supra.*] * * * The "specialist" is a floor broker, who undertakes to specialize in a limited group of stocks, and a firm conducting a "specialist" business is one which is represented by one or more such floor brokers. For the convenience of brokers and to expedite the execution of orders, all the stocks listed on the Stock Exchange are around different "posts" located on the floor. * * *

The specialist stations himself at one of the posts on the floor, where he remains from 10 a. m. to 3 p. m., accepting orders coming from other Stock Exchange members in the stocks listed at his post. He is always at his post, and the orders he receives are usually those impossible of execution at the time they are given out, but which come into force as the market advances or declines. The necessity for specialists arises from the rigid responsibility to which Stock Exchange members are held for the execution of orders when market conditions permit. At times, great loss would result to brokers doing business around the room, unless they could pass this responsibility on to the specialist.

When a specialist accepts an order from another member, he assumes responsibilities and liabilities which are recognized and ruled upon by the governors of the Exchange under the rules of the Exchange. In some cases, the specialist, when he buys and sells for a Stock Exchange house, "gives up" on a transaction—i. e., discloses the name of his principal. These transactions are cleared and settled by the Stock Exchange firms for whom the purchases or sales are made, and the specialist neither makes payment for the securities bought nor receives payment for the securities sold. He remains liable as a principal, however, to the party to whom he sold or from whom he bought until the due date of the settlement of the contract, although he takes no further part in the handling of the details pending the closing of the contract. He is responsible for the carrying out of the contract. In many cases, the specialist does not disclose the name of his principal, but gives either his own name or the name of the firm with which he is associated, in which case his liability remains as above. In a few cases a specialist may avoid liability where he specifically states at the time of the purchase or sale that he is buying or selling for the account of some other broker. The other broker then becomes liable, and the specialist steps out. Such a case is exceptional; as a general rule the specialist remains liable.

*     *     *     *     *     *     *

The specialist who executes orders received from other members of the Stock Exchange receives a certain proportion of the commission paid to the other Stock Exchange members by their customers; for instance, where stock has a par value of $100, the broker's commission is $15 per 100 shares. Of this $15, the specialist receives $2.50.

exceptions, from buying or selling for his own account securities for which he has accepted orders to buy or sell. See Charles H. Meyer, The Law of Stock Brokers and Stock Exchanges, § 51.

It is unnecessary to consider whether other brokers with or through whom the firm dealt were " customers." That was the principal point involved in the *Estate of Harry E. R. Hall*, 29 B. T. A. 1255, upon which petitioners rely. Even if it be conceded that a broker may be a customer, it does not follow that every one with whom a broker deals is a dealer or merchant. One who is admittedly a broker, or a speculator, may have customers—indeed he must have in the sense of having some one to sell to—but that does not make him a merchant.

We are accordingly of the opinion, and so hold, that petitioners have not sustained the burden of establishing that the respondent erred in refusing to classify their firm as a dealer within the meaning of the regulations.

Reviewed by the Board.

*Decision will be entered for the respondent.*

Murdock concurs in the result.

---

Smith, dissenting: In *Estate of Harry E. R. Hall*, 29 B. T. A. 1255, we held that specialists on the New York Stock Exchange who were engaged in the business of buying securities and reselling them to customers, principally members of the New York Stock Exchange, were entitled under article 105 of Regulations 74 to compute net income upon the basis of inventories at market. I think there are no material differences between the facts in this case and those which obtained in the above cited case. Furthermore, I am of the opinion that the petitioners here substantially met the requirements of article 105 to qualify them as dealers in securities. They have an established place of business; they are regularly engaged in the purchase of securities and their resale to customers, and those purchases and sales are made with a view to the gains and profits that may be derived therefrom. If the regulation was intended to apply only to underwriters or distributors of securities that fact is not made plain by the terms of the regulation, nor can I understand why such merchants of securities should be favored by the respondent over brokers who make a practice of buying for their own account and selling to customers the securities thus bought with a view to gains and profits to be derived therefrom.

Substantially the question presented here was considered by the Circuit Court of Appeals for the Second Circuit in *Harriman*

644

*National Bank* v. *Commissioner*, 43 Fed. (2d) 950. It was there held that a bank, maintaining a separate department for the buying and selling of securities, which sold securities when it thought the prices were reasonable, was a dealer in securities within the contemplation of article 1585 of Regulations 45, which corresponds with article 105 of Regulations 74.

As I see it, the only question which we have here is whether the petitioners qualify as dealers in securities as defined in the regulation. I think they do.

BLACK, MCMAHON, and LEECH agree with this dissent.