ESTATE OF HARRY E. R. HALL, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 70004–70010, 71592–71598. Promulgated February 27, 1934.

*Robert N. Anderson, Esq.,* for the petitioners.

*Mason B. Leming, Esq.,* and *Bernard D. Hathcock, Esq.,* for the respondent.

OPINION.

TRAMMELL: These are consolidated proceedings for the redetermination of deficiencies in income tax as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 70004 | Estate of Harry E. R. Hall | 1929 | $10,308.23 |
| 71598 | ____do____ | 1930 | 14,862.35 |
| 70005 | Marius A. Charavay | 1929 | 10,691.33 |
| 71592 | ____do____ | 1930 | 5,624.52 |
| 70006 | Byam K. Stevens | 1929 | 14,983.92 |
| 71593 | ____do____ | 1930 | 5,648.63 |
| 70007 | Justus Laube | 1929 | 9,350.40 |
| 71595 | ____do____ | 1930 | 5,237.08 |
| 70008 | Harry Price | 1929 | 492.34 |
| 71596 | ____do____ | 1930 | 286.76 |
| 70009 | William D. Stevens | 1929 | 6,467.53 |
| 71594 | ____do____ | 1930 | 3,687.33 |
| 70010 | John W. Walters | 1929 | 7,408.73 |
| 71597 | ____do____ | 1930 | 11,273.39 |

All issues raised by the pleadings, except one, were settled by a written stipulation signed by the parties and filed at the hearing, which stipulation is by reference adopted as a part hereof and will

[1] Proceedings of the following petitioners are consolidated herewith: Marius A. Charavay; Byam K. Stevens; Justus Laube; Harry Price; William D. Stevens; John W. Walters.

be given effect in redetermination of the deficiencies under Rule 50. The sole issue submitted for decision is whether or not the partnership of Stevens & Legg, hereinafter referred to as the partnership, of which the petitioners were members, was entitled to inventory at market its unsold securities on hand at the end of the calendar years 1929 and 1930 in computing net income for those years.

The Revenue Act of 1928 provides in pertinent part as follows:

SEC. 22. (c) *Inventories.*—Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Respondent's Regulations 74, promulgated under the Revenue Act of 1928, contain the following pertinent provisions:

ART. 105. *Inventories by dealers in securities.*—A dealer in securities, who in his books of account regularly inventories unsold securities * * * may make his return upon the basis upon which his accounts are kept; provided that a description of the method employed shall be included in or attached to the return, that all the securities must be inventoried by the same method, and that such method must be adhered to in subsequent years, unless another be authorized by the Commissioner. For the purpose of this rule a dealer in securities is a merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom. * * * Taxpayers who buy and sell securities for investment or speculation and not in the course of an established business, and officers of corporations and members of partnerships who in their individual capacities buy and sell securities, are not dealers in securities within the meaning of this rule.

We have held that the above quoted regulation is reasonable and designed fairly to carry out the terms and intent of the statute. *Northeastern Surety Co.,* 29 B.T.A. 297.

The partnership in computing net income as reported in its returns for the taxable years inventoried at market the unsold securities on hand at the end of each year. Respondent determined that the partnership was not " a dealer in securities " and therefore was not entitled to use inventories in computing net income for tax purposes. Thus, the issue resolves itself into the question of whether or not the partnership was a dealer in securities within the purview of respondent's regulation, since this is the only particular in respect of which respondent contends that the partnership failed to meet the requirements prescribed.

The evidence shows that the partnership of Stevens & Legg maintained an established place of business. Prior to 1929 its place of

business was at 49 Wall Street, and thereafter at 25 Broad Street, New York City. During the taxable years the firm had between twenty and thirty employees, and between four and seven partners. All of the partners, except one, were members of the New York Stock Exchange.

The business carried on by the partnership was that of a dealer in securities, and it also acted as a broker for third persons on a commission basis. It held itself out generally as a dealer in securities, and it was regularly and consistently engaged in the purchase and resale of securities.

During the taxable years the partnership bought and sold the common and/or preferred stocks of 14 different corporations, and had a large position in the stocks of the New York Dock Co. The firm purchased securities for the purpose of reselling them to its customers at a profit.

On occasion the partnership would purchase New York Dock stocks to maintain the dealer position which it had established, and as far as possible tried to prevent wide fluctuation in the securities. These stocks were not purchased by the partnership either for investment or speculation, but for future resale to customers at a profit. The firm was regarded as a predominant factor in securities of the New York Dock Co., and no one else was known in the trade as a dealer in those securities.

During the taxable years the partnership had regular and repeated dealings with the persons to whom it sold New York Dock Co. stocks. They were mostly members of the New York Stock Exchange and were dealt with as principals and customers. Every member of the Exchange was a potential customer. There was never a reasonable demand for the New York Dock stocks which Stevens & Legg was unable to fill, nor did the firm ever refuse to sell to any customer provided the price represented a reasonable profit and was a satisfactory price in the market. In addition to selling common and preferred stocks of the New York Dock Co. which it had bought and owned, the partnership also acted as broker in the purchase and sale of the securities of this company for third persons on a commission basis. Clearances of the purchases and sales of securities owned by the firm were during the taxable years made through its office.

During the year 1929 there were purchased and sold on the floor of the New York Stock Exchange by all persons a total of 99,000 shares of common and 9,300 shares of preferred stock of the New York Dock Co., and during 1930 the total purchases and sales of the same stocks aggregated 34,600 shares of common and 6,100 shares of preferred. Of the amounts stated, the partnership during 1929

purchased and sold, in its capacity as a dealer in securities owned by it, as distinguished from that of broker on a commission basis, 68,100 shares of common and 4,700 shares of preferred. During 1930 the firm in the same capacity purchased and sold 24,100 shares of common and 1,100 shares of preferred stock of the New York Dock Co.

The partnership had on hand the following number of shares of New York Dock Co. stocks at the dates indicated:

| December 31, 1928: | December 31, 1929: | December 31, 1930: |
|---|---|---|
| 5,500 common | 12,000 common | 13,500 common |
| 3,200 preferred | 2,300 preferred | 2,600 preferred |

During the taxable years the partnership had 101 different customers who purchased New York Dock common stock owned by it, and 268 separate sales transactions, which usually involved lots of 100 and 200 shares. The firm had 11 customers during 1929 and 1930 for the preferred stock owned by it, and 21 separate sales transactions, which usually involved 100 shares. Seven of the customers who purchased preferred stock also purchased common stock. The total number of customers purchasing both common and preferred stock was 105. The sales were well distributed over the weeks and months of the two years.

During the taxable years there were 2 sales transactions involving 1,000 shares of common stock, 17 transactions involving 500 shares, 2 transactions involving 400 shares, 9 transactions involving 300 shares, 42 transactions involving 200 shares, and 197 transactions involving 100 shares each. In the preferred stock during said years there were 1 transaction involving 400 shares, 3 transactions involving 300 shares, 2 transactions involving 200 shares, and 15 transactions involving 100 shares each. The largest number of separate sales transactions with any one customer was 22.

The partnership's income during the taxable years 1929 and 1930 consisted of the profits derived from the sales of its own securities to customers, the commissions that it received in cases where it acted as broker, dividends received from any securities which it owned, and interest or credit balances.

The partnership's books of account were kept on an accrual basis and all of its unsold securities on hand at the end of each year, including 1931, were regularly and consistently inventoried at market, which inventory entered into the computation of profit and loss for the particular year, and also entered into the computation of net income of the partnership as shown on its Federal income tax returns for the taxable years.

It was customary in the trade or business of dealers in securities to inventory securities on hand at the end of each year at the market

price. This method conformed to the best accounting practice in that trade or business. Dealers in securities follow this method because their transactions occur on the market basis. Securities used as collateral in connection with loans from banks are also valued at market, and reports made to the New York Stock Exchange are on the basis of market value, as well as cost. The method of inventorying securities on hand at market would be used in the best accounting practice in a financial balance sheet.

The foregoing facts, we think, are clearly sufficient to bring the partnership within all essential requirements of the respondent's regulation, and to establish its right to make its returns and to have its net income for 1929 and 1930 computed upon the same basis as that upon which its accounts were kept, that is, by inventorying unsold securities. The evidence is uncontroverted that in its books of account the partnership regularly inventoried at market unsold securities on hand at the end of each year, not only in the taxable years but in years both prior and subsequent thereto, and computed net income for tax purposes on the same basis.

We think also the proof shows that the partnership was a dealer in securities, as defined in respondent's regulation. It had an established place of business, and was a merchant regularly engaged in the purchase of securities and their resale to purchasers with a view to the gains and profits which might be derived therefrom.

Respondent does not seriously contend otherwise, except on one point. He argues that the partnership did not make sales of its securities to *customers*, because one who deals on a stock exchange is not a merchant in securities, selling to *customers*. The partnership purchased securities and kept them in stock for resale at a reasonable profit, in much the same way that a merchant buys and sells goods, wares, and merchandise. It purchased securities, according to the uncontradicted evidence, not for purposes of speculation or investment, but solely to resell to customers at a profit.

Most, but not all, of its resales were made to brokers who operated on the Stock Exchange. We see no reason why a broker, in such circumstances, may not properly be regarded as a *customer* of the partnership.

Webster's New International Dictionary defines *customer* as " one who regularly or repeatedly makes purchases of, or has business dealings with, a tradesman or business house; one who customarily has dealings with a business establishment; a buyer or purchaser; a patron." This definition, in substance, has received judicial approval. *Weinhouse* v. *Cronin* (Conn.), 36 Atl. 45.

The record discloses that the partnership in question had regular and repeated dealings with the same persons. During the taxable

years it made 268 separate sales to 105 purchasers, involving the stocks of the New York Dock Co., and during the same years made 22 separate sales of that stock to one person. Such persons, we think, were *customers* of the partnership.

*Donander Co.*, 29 B.T.A. 312, and *Oil Shares, Inc.*, 29 B.T.A. 664, are distinguishable on the facts from the present proceeding. In each of the cited cases we found that the petitioner was not a dealer, but was engaged primarily in investing or speculating as opposed to merchandizing securities. An entirely different situation is presented in the case at bar. The partnership with which we are concerned here is clearly shown by the evidence to have dealt in the stocks involved primarily as a merchant. While it purchased *through* brokers who were members of the stock exchange and sold to brokers as *principals or customers*, it held itself out as a merchant of securities and the transactions were cleared through its own office, not those of the brokers. It also purchased from and sold to others than brokers. We know of no good reason why a broker, even though acting for an undisclosed client, should not properly be regarded as a *customer* in the making of repeated purchases of securities owned and held for resale by the partnership.

In our opinion, however, the controlling factor here is not the method by which the partnership obtained customers or made sales. It is the fact that the partnership purchased securities and held them not for investment or speculation, but for resale at a profit to anyone who desired to buy.

A grocery merchant might, and as a matter of common knowledge often does, purchase goods through a broker, and he might resell through a broker or agent or clerk to whom he pays a commission. But such method of carrying on his business would not change the fact that he was a merchant in groceries, if he purchased and carried groceries in stock for resale at a profit to customers.

What we have said hereinabove applies particularly to the stocks of the New York Dock Co. In respect of those stocks we hold, for the reasons indicated, that the partnership was a dealer and entitled to compute net income by the use of inventories.

As to the other securities which petitioners contend the partnership had a right to inventory, the evidence is not so satisfactory. The number and volume of sales during the taxable years, and other detailed facts, are not shown. However, a preponderance of the undisputed evidence supports the conclusion that all of the securities in question were held for resale to customers and not for speculation or investment, and that the partnership would at any time sell at a reasonable profit any of the securities which it had on hand.

It is true that the partnership in some instances acted as a broker for third persons in the purchase or sale of securities on a commission basis, and it also derived some income from interest on credit balances, but these transactions did not involve the stocks here in dispute, and such activities were only incidental to its principal business of dealing as a merchant in securities.

Respondent's determination on this issue is reversed.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

STERNHAGEN and ARUNDELL concur only in the result.

ADAMS dissents.