SECURITIES-ALLIED CORPORATION (FORMERLY CHATHAM PHENIX ALLIED CORPORATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78577.   Promulgated June 18, 1937.

*Mabel Walker Willebrandt, Esq.,* and *C. J. McGuire, Esq.,* for the petitioner.

*Harold Allen, Esq.,* for the respondent.

OPINION.

ARNOLD: This proceeding comes before us on respondent's determination of a deficiency in petitioner's income tax for the year 1930

in the amount of $313,012.41. Two issues are presented: First, whether petitioner is a dealer in securities within the meaning of Treasury Regulations 74, article 105, so as to allow it the privilege of returning its income on the basis of inventory, and second, whether petitioner is entitled to deduct any part of the cost of a certain corporation's debentures held by it as a debt ascertained to be worthless in the year. Another issue raised was conceded by respondent.

The essential facts were all stipulated, a supplemental stipulation being filed on May 14, 1937, for the purpose of clarifying a seeming ambiguity in the original stipulation. Petitioner at the hearing produced two expert witnesses merely to establish the correctness of its method under general accounting practice. Since as to the primary issue the instant case raises the same question as that presented, in respect of its next preceding tax year 1929, by its prior proceeding before this Board, Docket No. 67847, which was decided September 5, 1934 (the opinion being unreported), the parties here have stipulated that the evidence adduced in that case shall be also considered here.

The petitioner corporation was organized on September 28, 1929, under the laws of the State of Delaware. At the time of its incorporation its name was Chatham Phenix Allied Corporation. This name was later changed to Securities-Allied Corporation, the change being a change in name only. By its charter petitioner in general was empowered to buy, sell, and trade in equities, stocks and securities of any kind, to participate in underwritings and syndicates, and to engage in such other investment activities as its board of directors might determine. A copy of the charter and bylaws of the corporaton were put in evidence.

Pursuant to article III of the bylaws of the petitioner the executive committee, composed of five members of the board of directors, was formed. Each morning this committee had a meeting for the purpose of determining what securities should be bought or sold. The corporation had a stock ticker in its office and the members of the executive committee were available for informal consultation during each day. In addition to having general statistical and ticker information at its command, petitioner employed experts to make studies of the financial conditions of various corporations and, based upon their studies, to make recommendations as to the desirability of purchasing securities of the corporations in respect of which the studies were made. Although some investigations were made in 1929 after the petitioner was organized, because of the stock market crash of that year actual purchases of securities in such corporations were not made until the year 1930.

At the time of its organization petitioner issued 1,900,000 shares of nonvoting common stock without par value at the price of $25 per share and 100,000 shares of voting common stock also at the price of $25 per share. This was accomplished by an agreement with a corporation named Chatham Phenix Corporation, under which the latter corporation agreed to subscribe to the entire issue of voting common stock and to purchase or procure purchasers for the 1,900,000 shares of nonvoting common stock. The Chatham Phenix Corporation was an affiliate of the Chatham Phenix National Bank & Trust Co. and the latter company acted as transfer agent of the stock in New York City. The Old Colony Trust Co. of Boston, Massachusetts, was appointed transfer agent in Boston, Massachusetts.

During the calendar year 1930 petitioner was engaged in the business of buying and selling securities. All transactions, except the purchase of bonds of Empire State, Inc., having a par value of $6,750,000, were made through the Chatham Phenix Corporation or through brokers. No purchases or sales were made for the accounts of customers. Among its other activities petitioner financed and underwrote the stock or securities of other corporations. Petitioner had no selling organization of its own, but had available to it the facilities and sales organization of the Chatham Phenix Corporation, which maintained offices in several of the principal cities of the United States. Purchases and sales were made with a view to the gains and profits that might be derived therefrom. Petitioner is what is commonly known as a "management investment trust."

During the calendar year 1930 petitioner made purchases and sales of stocks and bonds as follows:

|  | Number of transactions | Number of shares | Par value of bonds | Cost |
|---|---|---|---|---|
| *Purchases* |  |  |  |  |
| Stocks | 2,886 | 813,618 | | $36,763,233.32 |
| Bonds | 144 | | $14,330,000 | 13,360,804.76 |
| *Sales* |  |  |  | *Selling price* |
| Stocks | 1,241 | 373,942 | | $27,180,661.44 |
| Bonds | 24 | | 4,044,000 | 3,882,870.00 |

Included in the purchases of bonds were $6,750,000, par value of the second mortgage 7 percent, sinking fund gold debentures of Empire State, Inc., which the petitioner acquired directly from Empire State, Inc., for $6,075,000 on April 8, 1930, for the purpose of resale direct to the public. None of these debentures was offered for sale and none was sold by the petitioner.

All purchases made by petitioner during the calendar year 1930 were recorded on its books at cost. In closing its books for the cal-

endar year 1930 petitioner followed the method adopted at its organization in 1929 of inventorying its securities on the basis of cost or market, whichever was lower. In many instances at December 31, 1930, market was lower than cost.

The cost of securities owned by petitioner on December 31, 1930, was $31,881,952.68. The value of the inventory exclusive of Empire State debentures on December 31, 1930, valued at cost or market, whichever was lower, was $16,988,557.51. In closing its books for the year ended December 31, 1930, petitioner made an adjustment to reflect a decline in the market value of its inventory by writing off under profit and loss the amount of $8,818,395.17, which, however, did not include any adjustment for the decline in the value of the Empire State debentures which had cost $6,075,000. It was stipulated that on December 31, 1930, the Empire State debentures had declined in value and were worthless to an extent sufficient to eliminate any remaining taxable income, provided (a) petitioner is entitled to inventory its securities at cost or market, whichever was lower, or (b) is entitled to a deduction on account of the partial worthlessness of such debentures as a bad debt. By supplemental stipulation filed May 14, 1937, the parties agreed that this should not be construed as an admission by respondent that debentures of Empire State, Inc., will be partially worthless to any extent at maturity.

On its books at December 31, 1929, petitioner inventoried securities on hand on the basis of cost or market, whichever was lower. The respondent denied petitioner the right to inventory its securities and was sustained by this Board in the proceeding in Docket No. 67847. A petition for review of the Board's determination is now pending in the United States Circuit Court of Appeals for the Second Circuit.

The cost of securities owned by petitioner on December 31, 1929, was $16,825,490.84. The value of such inventory on December 31, 1929, valued at cost or market, whichever was lower, was $15,864,066.25. In closing its books for the year ended December 31, 1929, petitioner made an adjustment to reflect this decline in inventory value by writing off against profit and loss the difference of $961,424.59.

During the year 1930 petitioner purchased, for resale in the ordinary course of its business, 171,623 shares of its own common capital stock at a cost of $3,807,561.20. In the year 1930 petitioner sold these shares for $3,372,938.11, thus sustaining a loss of $434,623.09. In its income tax return for 1930 petitioner reported a net profit of $1,810,136.99 on sales of securities. This amount did not reflect the aforesaid loss of $434,623.09, and that loss was not allowed as a deduction from gross income in computing the tax liability of peti-

172

tioner as shown by the deficiency notice. Respondent now concedes that the amount of $434,623.09 constitutes an allowable deduction pursuant to the provisions of T. D. 4430, C. B. XIII-1, p. 36.

In its income tax return for the calendar year 1930, petitioner reported a loss of $5,735,302.82. The loss as shown by its books for that period is $4,492,047.27. The excess of the loss shown on the tax return over that shown on the books ($1,243,255.55) represents nontaxable dividends ($1,244,221.96) minus depreciation of $966.41. In arriving at the loss shown on its return and the loss shown on its books, petitioner deducted from its gross income the inventory adjustment of $8,818,395.17, referred to above. Respondent denied petitioner the right to inventory its securities at December 31, 1930, on the basis of cost or market, whichever was lower. In his determination of taxable income for the calendar year 1930, respondent has given effect to a net deduction of $574,080.29, which represents the excess of the cost over the market value at December 31, 1929, of securities on hand at December 31, 1929, which were sold during 1930.

Petitioner kept its books of account and made its income tax return on the accrual basis.

Respondent, in his deficiency notice from which the instant appeal was taken, determined that petitioner's net income for the calendar year 1930 (without employment of inventories) was $2,608,436.75.

The issues were formulated and their outcome, as applied to the facts stipulated, were stipulated as follows:

(a) If petitioner is entitled to inventory the securities which it had on hand at the beginning and those which it had at the end of the year 1930, it sustained a loss in that year and there is no deficiency.

(b) In the alternative, if petitioner is entitled at December 31, 1930, only to inventory the debentures of Empire State, Inc., it sustained a loss in the year 1930 and there is no deficiency.

(c) In the alternative, if petitioner is entitled to deduct, as a debt worthless in part, the loss which it suffered on the said debentures of Empire State, Inc., there is no deficiency. [Amended by the supplemental stipulation to indicate that "nothing in [this paragraph] . . . shall be construed as an admission by the Respondent that debentures of Empire State Inc. will be partially worthless to any extent at maturity."]

(d) The loss of $434,623.09 sustained by petitioner in the year 1930, through trading in its own stock, as determined by respondent in the Notice of Deficiency, reduces petitioner's income to $2,173,813.66. This adjustment would reduce the deficiency to $260,857.64.

1. The first question is whether petitioner is a dealer in securities.

The Commissioner, in article 105 of Treasury Regulations 74, defines a dealer in securities as a merchant of securities with an established place of business regularly engaged in the purchase of securities and their resale to customers, as one who as a merchant buys securities and sells them to customers with a view to the gains

and profits that may be derived therefrom. Taxpayers who buy and sell or hold securities for investment or speculation and not in the course of an established business are not dealers in securities.

We held in the earlier case that petitioner did not fall within this category in 1929 and so was not entitled to claim the privilege of inventory, relying on *Adirondack Securities Corporation*, 23 B. T. A. 61; *Northeastern Surety Co.*, 29 B. T. A. 297; *James B. Lowell*, 30 B. T. A. 1297; *Alfred E. Hamill*, 30 B. T. A. 955. In 1929 the petitioner carried on investigations of certain corporations with a view to purchase of their securities, but, because of the stock market crash of that October, made no actual purchases in that year. Its purchases and sales of stock and securities in the instant year, 1930, were, however, extensive, as the stipulated facts show. The character of petitioner as a management investment trust remained the same for both years.

Petitioner produced at the hearing of the instant case two expert witnesses of high qualifications and standing in their profession of public accountancy, Hughes and Auld. They testified, subject to objections which are now overruled. They stated that recognition of the shrinkage in value of securities at the close of the taxable year, by taking cost or market, whichever was lower, would most clearly reflect income. This was the method followed by petitioner in 1929 and 1930. But the latter witness admitted on cross-examination that the inventory method would most clearly reflect the income of any taxpayer engaged in buying and selling any commodity or merchandise, provided there was fluctuation of value and the means of readily ascertaining the degree of that fluctuation. Upon this expert testimony, however, petitioner rests the contention that the respondent has no discretion under section 41 of the Revenue Act of 1928, set out in the margin,[1] to require the petitioner to compute its income otherwise than by inventories. The invalidity of this argument is apparent on its face, for the very section upon which petitioner relies refers at its close to the inventories section 22 (c), set out in the margin,[2] which expressly leaves to the Commissioner, and not to the

---

[1] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. (For use of inventories, see section 22 (c).)

[2] SEC. 22. (c) *Inventories.*—Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

taxpayer, the determination of the conditions under which inventories may be employed—"Whenever *in the opinion of the Commissioner* the use of inventories is necessary * * *." (Italics supplied.)

The inventory method is entirely exceptional, and as an exceptional method its employment is closely confined by the statute to exceptional circumstances which are to be determined by the Commissioner in his discretion.

As to the Commissioner's discretion, we said in the *Hamill* case, *supra* (p. 958) :

The method of determining taxable income by the use of inventories has always been recognized as special and as involving problems of general administration peculiarly cognizable by the Commissioner. * * * [Quoting sec. 22 (c), Rev. Act 1928.] Fortified with such a clear sanction in the statutory grant of power, the administrative determination in such a case must survive all but the strongest attack. Short of being arbitrary or capricious or based on a clear demonstration of error, the determination in any single instance ought not to be disturbed. This is not a matter of jurisdiction, for the Board clearly has the power of review, *Blair* v. *Oesterlein Machine Co.*, 275 U. S. 220, but is rather an attitude of the Board in the exercise of its jurisdiction not to interfere lightly with general administrative matters which the Congress has entrusted to the Commissioner's discretion. * * *

And we further pointed out in that case that proof that the respondent has erred in denying use of this method puts a heavier burden on the taxpayer than the overthrowing of a purely factual determination. Respondent's determination may not be arbitrary, *Reynolds Cattle Co.*, 31 B. T. A. 206, but it can be disputed in the courts only if it is "plainly arbitrary", *Lucas* v. *Kansas City Structural Steel Co.*, 281 U. S. 264; *Finance & Guaranty Co.* v. *Commissioner*, 50 Fed. (2d) 1061. Here petitioner has put in no evidence to show a distortion of income resulting from the denial of inventories; the testimony of its witnesses stops far short of this. It is not shown that the Commissioner's action does not properly reflect the income or that it is arbitrary or capricious.

Petitioner relies on the recent cases of *Commissioner* v. *Stevens*, 78 Fed. (2d) 713 (C. C. A., 2d Cir.), affirming *Harry E. R. Hall, Estate*, 29 B. T. A. 1255; and *Commissioner* v. *Charavay*, 79 Fed. (2d) 406 (C. C. A., 3d Cir.), affirming 29 B. T. A. 1255.

In the *Stevens* case (*sub nom.* Hall) we pointed out that the partnership clearly dealt in the stocks involved "primarily as a merchant." And the Circuit Court in its affirming opinion also called attention to the same fact, saying :

The dealings of the respondent's firm may not be said to be speculative only. The firm held at all times large blocks of stock which it sold in small lots to its various customers, numbering at least one hundred, at different times, and it sold at different prices. It bought additional blocks of stock with which to

replenish its supply. At all times it had shares of the stock to be sold for profit or loss, as the case may be, on resale. This was its wares or stock in trade. While Seeley was a speculator, or trader, in the sense of speculation, this firm, as merchants, bought stock to keep on sale for its customers' supply and demand.

The Circuit Court thought, as we did, that the fact that petitioner's customers were brokers was immaterial, but the essential fact was clearly established, that the firm bought stock primarily for resale to its customers. The *Charavay* case arose out of the same state of facts as the *Stevens* case and was disposed of on the same ground. Petitioner here was buying and selling for the gains and profits to be derived, according to the stipulated facts, but any shift in its securities made by an investment trust might well be done with a view to gain. That fact does not establish petitioner's status as a "merchant." Merchants and speculators alike hope for gain on their turnover, but this is not enough. The taxpayer must be *"regularly engaged* in the purchase of securities and their resale to *customers."* It must hold itself out as a merchant to any who would buy, and would thus presumably acquire in time regular customers. *Oil Shares, Inc.*, 29 B. T. A. 664; *Schafer* v. *Helvering*, 299 U. S. 171, affirming 32 B. T. A. 289.

Learned Hand, J., in *Seeley* v. *Helvering*, 77 Fed. (2d) 323, drew the essential distinction between a merchant and a speculator in these words:

* * * Article 105 meant by a "merchant" a dealer who bought securities for himself and sold them to investors who might or might not rely upon his advice. While the security business is usually conducted by brokers who act only as agents, such merchants are by no means unknown; they do a business exactly like any other merchant. Besides, a merchant, ordinarily at least, does not resell to the same class of persons from whom he buys; he is a middleman in distributing the goods. Seeley was a speculator.

, The Supreme Court, affirming the Circuit Court in *Schafer* v. *Helvering*, *supra*, quotes with approval the language of the Board as follows:

The Board of Tax Appeals found: "The stocks in dispute were purchased for the firm's own account solely on expectation of a rise in the market, for sale to any one at a profit, 'as distinguished from a purchase to create a stock of securities to take care of future buying orders in excess of selling orders.'" "They were purchased solely in expectation of a rise in the market, for the partnership's own account of resale, to any buyer, at a profit. The meaning of 'dealer in securities', as defined in the controlling regulation, has been considered many times by the courts, and this Board. It is limited to one who, as a merchant, buys and sells securities to customers for the profit thereon."

And in the companion case, *Helvering* v. *Fried*, 299 U. S. 175, decided by the Supreme Court on the same day, the Court sustained the contention of the taxpayer, a "specialist" in certain stocks on the New

York Stock Exchange, that it was a "dealer in securities", on the ground that it "had an established place of business; that it regularly engaged in the purchase of certain specified securities and their resale to customers; that as a merchant it bought securities and sold them to customers with a view to the gains and profits that might be derived therefrom."

We have carefully considered all the evidence in the record and conclude that it is not sufficient to overcome Commissioner's determination that petitioner was not a dealer in securities within the meaning of Treasury Regulations 74, article 105, so as to allow it the privilege of returning its income on the basis of inventory for the year 1930.

Petitioner alternatively contends that if it was not a dealer in securities in general, it was at least so in respect to the Empire State debentures which it held on December 31, 1930, the stipulated decline in the value of which from cost would, if allowed, wipe out the deficiency. This contention rests on the stipulated facts that these debentures were bought by petitioner directly from Empire State, Inc., "for the purpose of resale direct to the public." There immediately follows in the stipulation, however, this fact: "None of these debentures were offered for sale and none were sold by the petitioner." We think that any claim of right of inventory that might be founded on the first statement is negatived by the second. Petitioner acquired these debentures on April 8, 1930, and had not offered them for sale by December 31 of that year. A bare intention to sell, even if "the public" be taken as the equivalent of "customers" in the regulations, without more can not convert the petitioner into a "merchant * * * regularly engaged" in buying and selling securities to customers. It was held, in an analogous situation in *Vaughan* v. *Commissioner*, 85 Fed. (2d) 497, that something more ought to be shown than a mere statement by the taxpayer that he held particular bonds "for the purpose of * * * supplying customers when they wanted to buy them." As we have already said, the privilege of inventory is an exceptional one under the statute, and to claim its benefit the petitioner should clearly bring himself within the privileged class as defined by the regulations.

We are of the opinion that the privilege of inventory in respect of the Empire State debentures must likewise be denied.

2. We now pass to petitioner's second alternative contention; that petitioner is entitled to deduct as a debt worthless in part, under section 23 (j), Revenue Act of 1928, the difference between the cost to petitioner of the Empire State debentures and their stipulated value on December 31, 1930. Such a deduction would wipe out the deficiency. This claim rests on Regulations 74, article 194, set out in

x

y

the margin.[3] A careful reading of the regulations makes it clear that a deduction on bonds is to be taken only under strictly limited conditions, none of which petitioner has met.

But in its original brief petitioner contended that respondent had admitted the partial worthlessness of these debentures in his stipulation. The precise words quoted from paragraph 5 are as follows: "On December 31, 1930, the Empire State debentures had declined in value and were worthless to an extent sufficient to eliminate any remaining taxable income, provided petitioner is entitled to inventory its securities at cost or market, whichever was lower, or entitled to a deduction on account of the partial worthlessness of such debentures." The supplemental stipulation provides:

* * * that nothing contained in paragraph 5 * * * shall be construed as an admission by the respondent that debentures of Empire State Inc., will be partially worthless to any extent at maturity.

Obviously the decline in value and partial worthlessness, as stipulated, means nothing more than a decline in fair market value of the debentures on the date mentioned. It goes no further, therefore, than to relieve the petitioner of proving that fact. Other requirements provided by the regulations cited must be established by petitioner before it is entitled to the deduction, among which is that obligor's financial status is such that there is no reasonable expectation of greater recovery upon maturity of the obligations. Admission of a decline in value of securities prior to maturity by no means implies an admission as to the obligor's ultimate condition or that its obligations will not be paid or paid only in part upon maturity. We may take judicial notice of the fact that after October 1929 there was a general decline of many stocks and bonds on the market, regardless of the issuing corporation's assets, and this may account for the decline in these bonds. The regulations cited provide that the taxpayer must "demonstrate to the satisfaction of the Commissioner"

---

[3] Art. 194. *Worthless securities.*—Where bonds purchased before March 1, 1913, depreciated in value between the date of purchase and that date, and were in a later year ascertained to be worthless and charged off, the owner is entitled to a deduction in that year equal to the cost of the bonds. Bonds purchased since February 28, 1913, when ascertained to be worthless, may be treated as bad debts to the amount actually paid for them. Bonds of an insolvent corporation secured only by a mortgage from which on foreclosure nothing is realized for the bondholders are regarded as ascertained to be worthless not later than the year of the foreclosure sale, and no deduction for a bad debt is allowable in computing a bondholder's income for a subsequent year. A deduction for a bad debt based upon the value of the debt on March 1, 1913, is allowable only when such value is established to the satisfaction of the Commissioner.

A taxpayer (other than a dealer in securities) possessing debts evidenced by bonds or other similar obligations can not deduct from gross income any amount merely on account of market fluctuations. Where a taxpayer ascertains, however, that due, for instance, to the financial condition of the debtor, or conditions other than market fluctuations, he will recover upon maturity none or only a part of the debt evidenced by the bonds or other similar obligations and so demonstrates to the satisfaction of the Commissioner, he may deduct in computing net income the uncollectible part of the debt evidenced by the bonds or other similar obligations.

that the "financial condition of the debtor, or conditions other than market fluctuations" are such that he, the bondholder, will "recover upon maturity none or only a part of the debt evidenced by the bonds", and then and then only, may he deduct the uncollectible part of the debt evidenced by the bonds. We know nothing of the Empire Co.'s assets. We know nothing of its liabilities except as to the bonds here involved. We do not even know when the bonds will mature. Petitioner has presented no evidence upon this point or upon the financial condition of Empire State, Inc., in December 1930, or upon its probable state at the time of the bonds' maturity. Without such evidence we can not be expected to overthrow the respondent's determination. *Citizens National Bank of Orange*, 33 B. T. A. 758. In the circumstances, the deduction must be denied.

The issue of the loss claimed on the sale by petitioner of certain shares of its own capital stock purchased in the market has been stipulated in petitioner's favor.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

Leech and Disney concur only in the result.