## LEACH CORPORATION v. BLACKLIDGE.
### No. 44612.

District Court, N. D. Illinois, E. D.
June 7, 1938.

Bank & Scribner, of Chicago, Ill., for plaintiff.

Michael L. Igoe, of Chicago, Ill., for defendant.

HOLLY, District Judge.

This is an action to recover the sum of $17,493.57, which, plaintiff avers, it erroneously paid as income tax for the five month period from July 19, 1929, to December 31, 1929. The tax was paid in four installments, three of $4,373.39 each, paid respectively on the 15th day of the months March, June and September, 1930, and one of $4,373.40 paid December 15, 1930.

Plaintiff avers that in its return it erroneously determined its income tax for that period upon inventory at cost basis, whereas, as a dealer in securities, it was entitled to report its income or loss on the basis of inventory at cost or market, whichever was lower. On September 17, 1931, plaintiff filed its claim for refund. On January 19, 1932, plaintiff was advised by the Commissioner that the claim for refund would be rejected, and thereafter on April 22, 1932, the claim was rejected by the Commissioner and plaintiff notified thereof. Plaintiff, however, sets forth in its complaint certain proceedings which, it asserts, amounted to a reconsideration of the claim by the Commissioner, and that said claim was not finally rejected until November 20, 1934.

Defendant in its answers denies that plaintiff is entitled to recover, denies that after April 22, 1932, the Commissioner reopened and reconsidered plaintiff's claim for refund, denies that plaintiff was a dealer in securities and asserts that the action, as to the installments paid in March and June, 1930, was not commenced within the statutory period.

The jury was waived and the cause submitted upon evidence heard by the court. Several questions are presented by the pleadings.

First, as to the timeliness of the suit with respect to payments made on March 15, and June 15, 1930, respectively. Suit was commenced July 13, 1935. Section 3226 of the Revised Statutes as amended by Section 1113(a) of the Revenue Act of 1926, 44 Stat. 116, provides that no suit for the recovery of internal revenue tax shall be begun after the expiration of five years from the date of the payment of such tax unless such suit is begun within two years after the disallowance by the Commissioner of Internal Revenue of the part of such claim to which such suit relates.

More than five years had elapsed from the dates of the payments above mentioned to the date of beginning suit. But plaintiff contends that the suit was begun within two years after the rejection of the claim for refund by the Commissioner.

To obtain a clear understanding of plaintiff's contention it will be necessary to give a history of the proceedings before the Commissioner upon plaintiff's 1930 return as well as upon the return for the year 1929.

On or about March 15, 1930, plaintiff filed its income tax return for the five months' period above mentioned disclosing a net income of $159,032.41 and an alleged tax liability of $17,493.57. On May 15, 1931, an extension of time having been secured, plaintiff filed its corporate income tax return for the calendar year, 1930, disclosing a net loss of $1,403,137.65.

In this return plaintiff based its report on an inventory of its securities at market or cost, whichever was lower, and on or about the same date it filed an amended return for the said five months' period of 1929, disclosing a net loss of $1,443,930.08. In arriving at the net loss for the year 1930 of $1,403,137.65, plaintiff deducted from gross and net income the net loss sustained by it in said 1929 period of $1,443,930.08.

On September 17, 1931, plaintiff filed a claim for refund of $17,493.57, the tax paid by it for the 1929 period. The basis of the claim was stated to be "Inventory of securities at December 31, 1939, was reported at $5,442,138.99, whereas correct inventory figure priced at lower of cost or market was $3,839,176.50. The assets as at December 31, 1929, include stocks in companies then desperate and of no value." On April 22, 1932, the Commissioner rejected the claim for refund, and plaintiff was notified thereof on that date.

On January 10, 1933, plaintiff was advised that an examination of its books for the year 1930 disclosed a proposed deficiency in tax of $39,753.37, due to disallowance from gross and net income for 1930 of plaintiff's net loss of $1,443,930.08 for the 1929 period, and disallowance of plaintiff's

use of inventories for 1930 at cost or market, whichever was lower, as allowed dealers in securities, resulting in a determination of an additional income of $290,485.68.

In a letter dated April 11, 1933, plaintiff was advised that the recommendations of the Revenue Agent as contained in his report for 1930, disclosing a proposed deficiency in tax of $39,783.37, had been approved. Shortly thereafter plaintiff filed a protest against the agent's determination as approved by the Commissioner. During the latter part of April, 1933, plaintiff filed with the Commissioner a waiver, on form 872, consenting to the assessment of the income and profits for the year 1930 at any time on or prior to June 30, 1934. The consent was accepted by the Commissioner.

On May 1, 1933, plaintiff's attorney called upon "one of the Commissioner's representatives" and requested a reopening and reconsideration of plaintiff's claim for refund for the five month period of 1929 because, as stated by plaintiff, both the 1929 period and the year 1930 involved the same facts. The Commissioner's representative advised plaintiff's attorney that no formal request for consolidation would be necessary inasmuch as consideration would be given to both at the same time. On September 7, 1933, the "Commissioner's representative" advised plaintiff's counsel that as the claim for the 1929 refund had been rejected, he could not take up the claim for 1930 until the 1929 case had been disposed of. As a consequence of this statement a letter was addressed to the Commissioner by plaintiff's counsel on the same day, requesting that the claim for refund be reopened and reconsidered by the Commissioner, and that the matter be referred to a Mr. Wilson for consideration in connection with the protest filed with respect to the proposed deficiency tax of 1930. (Plaintiff's Ex. 8). On October 6, 1933, the Commissioner advised plaintiff's counsel by letter that his request for the reopening of the claim for refund would be denied, basing the refusal upon his opinion that the evidence in the record did not show that the taxpayer was a dealer in securities. (Plaintiff's Ex. 10).

On December 1, 1933, plaintiff's counsel was advised that 1929 and 1930 had been consolidated for a joint hearing before the Commissioner's representatives, Jones and Wilson, Jones being the conferee as to 1930 and Wilson as to 1929. A joint hearing was held, December 6, 1933, and plaintiff's attorney was told that the information on file was not sufficient to dispose of "the dealer" question. The next day plaintiff's attorney addressed a letter to "Mr. Ralph R. Reed, Technical Advisor, Deputy Commissioner," stating that the time for the deficiency assessment for 1930 did not expire until June, 1934, and he understood that it would be satisfactory if the whole matter could be held in status quo until evidence on the question could be collected and briefs submitted. No additional evidence was furnished and on April 14, 1934, a letter was sent to and received by plaintiff's attorney in which, after referring to the letter of September 7, above mentioned, and the conference of December 6, 1933, it was stated that, no additional evidence having been furnished, the office had concluded, after a careful review of the whole record in the case, that the action expressed in the letter of October 6, 1933, should not be modified.

From the above statement of facts it appears that plaintiff filed its claim for refund on September 7, 1931, and the claim was rejected on April 22, 1932, more than two years prior to the filing of plaintiff's suit. But plaintiff contends that the subsequent dealings amounted to a reopening and reconsideration of its claim, and that the claim was not finally rejected until April 14, 1934.

■ I am of the opinion that the claim was finally rejected April 22, 1932. The facts in this case are entirely different from those in the cases upon which plaintiff relies.[1] A case more nearly like the case at bar in the facts is Ford Motor Co. to Use and Benefit of Jewel Tea Co. v. United States, Ct.Cl., 3 F.Supp. 423, where the court held that if the Commissioner of Internal Revenue has reopened and reconsidered on the merits a disallowed claim for refund the taxpayer has two years after the final decision to bring suit. It must appear, however, that the Commissioner has in fact reopened the case and reconsidered it on its merits, and where the Commissioner, after the receipt of a request to have the case reopened and reconsidered, merely re-examines the files of his own of-

[1] Watts v. United States, 2 Cir., 82 F. 2d 266; McKesson & Robbins v. Edwards, 2 Cir., 57 F.2d 147; Savannah Bank & Trust Co. v. United States, Ct. Cl., 58 F.2d 1068; Dixon v. United States, D.C., 13 F.Supp. 620.

fice and reviews the papers in the case for the purpose of determining whether there is any basis for the taxpayer's request to have the case reopened, and later notifies the taxpayer of his refusal to reopen the case, the suit must be brought within two years after the disallowance of the claim, and the taxpayer does not have two years after the refusal to reopen his case.

It is my conclusion that, upon the facts of this case, action was not commenced for the recovery of the first two installments of the 1929 tax within the time limited by the statute.

Further, was the plaintiff during the period in question a dealer in securities, and so entitled to report its income or loss on the basis of an inventory of its securities?

█ Plaintiff is a corporation, organized under the laws of Delaware, and authorized by its charter to engage in numerous activities. Its character, in this case, must be determined from what it did, not what it was authorized by its charter to do.

Shortly after its organization it issued a prospectus in which it described itself as a "Financial and Investment Company." Its purpose as set forth in the prospectus was as follows:

"The Corporation will conduct a general financial and investment business, employing its funds for such purposes as its powers permit and as may be considered to promise a profitable return; but always with a view to realizing such profits by the constant use and frequent turnover of capital rather than by permanent ownership of stocks and securities.

"A part of the Corporation's capital may, however, be invested in stocks and securities for the purpose of receiving dividends and interest, and to realize profits from the sale of holdings which have appreciated in value, although the permanent investment of its funds in the capital stock of one or more companies is not contemplated. While diversification is not a primary object, the portfolio of investments will usually cover a rather broadly diversified range of industries and territory, and the Corporation's funds will be correspondingly, safeguarded.

"Besides investment of capital in stocks and securities, a principal object of the corporation is to underwrite the sale of new issues and operate trading accounts; and to organize, manage, and/or participate in banking groups formed to underwrite and distribute security issues, and in syndicates formed to conduct market operations. The holders of the Corporation's capital stocks will thus gain the opportunity to participate indirectly in financial operations which ordinarily is not available to them as individuals.

"From time to time a substantial or controlling interest may be acquired in corporations whose business and earnings are believed to be susceptible of material increase and whose common stocks therefore afford exceptional opportunity for profit. The Corporation may organize companies to engage in and develop industrial, commercial or other businesses if such new enterprises are believed to offer justifiable possibilities of earnings and/or enhancement in value. Responsibilities of management and financing may be assumed and the Corporation may act as fiscal agent, particularly for companies in which it holds interest.

"Earnings.

"The earnings of the Corporation will be derived chiefly from (1) dividends and interest on its investments, (2) profits realized from sale of stocks and securities, (3) fees and profits from underwritings and syndicates, and (4) fees and commissions received for other services rendered."

██ Mr. George T. Leach, president of plaintiff, testified that A. B. Leach & Co., Inc., and a group of the stockholders of plaintiff acquired additional capital for the corporation by means of sales of shares of stock of plaintiff for the purpose of "conducting an investment business, buying and selling securities, to assist companies in getting the necessary working capital looking towards the time when securities would be available for the market." The A. B. Leach Company was an organization of some 175 salesmen, having 14 offices in various cities, and was at all times interested in purchasing and selling securities, and plaintiff had an arrangement with A. B. Leach & Co., Inc., to pay the latter company $60,000 a year for its services. Immediately after its organization plaintiff proceeded to acquire securities which its officers "deemed to be acceptable, marketable and profitable." Records were kept of purchases and sales of stock. Plaintiff's officers bought the stock "for our own portfolio, to be distributed later." These stocks were afterwards sold "if it was possible to do so." The sales were made through A.

B. Leach Company. Some stocks were sold to the A. B. Leach Company, stocks of the Allied Motors Corporation and the American Aeronautical Company. It was the intention to put all the aircraft business in one company whose securities were to be offered to the public.

On cross examination Mr. Leach testified that it was the purpose of plaintiff in acquiring stocks to hold them until they were ready for the market, that is, the stock in a corporation would be purchased while the corporation was in the formative stage and held until it was a going concern with earnings and assets, and the distribution to the public justified.

I am of the opinion that plaintiff was not a dealer in securities within the meaning of the Treasury Regulations. A dealer or merchant in securities is one who, like any other merchandiser, lays in his stock of goods to be sold to customers as they come along. He does not buy for investment, expecting to derive his income from dividends or interest, nor does he buy to hold until a rise in the market shall make it profitable to sell.

It is true that plaintiff intended to resell securities purchased by it, but not as a merchant sells his goods to those who come to his place of business to buy. On the contrary, the plan was to buy and then hold securities until there was an opportunity to sell at a profit. It bought securities of concerns which were in the formative stage "to be held until they were ready to be distributed, because by that day the concern was a going concern with earnings and assets and we were justified in distributing them to the public." That is not merchandising, that is investment or speculation. Neither were the activities of plaintiff in attempting to put all the aircraft business of the country in one company, whose securities would later be offered to the public, merchandising. It was pure speculation. Plaintiff's business was not that of a dealer in securities.

This conclusion, I think, is in harmony with the opinion of the Circuit Court of Appeals of the Second Circuit in Commissioner of Internal Revenue v. Stevens, 78 F.2d 713, and Fried v. Commissioner, 2 Cir., 83 F.2d 193, affirmed Helvering v. Fried, 299 U.S. 175, 57 S.Ct. 150, 81 L.Ed. 104. · In Schafer v. Helvering, 65 App.D.C. 292, 83 F.2d 317, the court held that petitioners were not dealers in securities, and

in discussing the nature of their business said (page 319):

"What they did was to use their funds and their expert knowledge of market conditions in the purchase on the exchanges of stocks and bonds from brokers, in anticipation of a rise in price, and the subsequent sale of the same stocks and bonds, under the same conditions, through the same or other brokers. The motive was neither more nor less than that which induces every such transaction by the public generally—transactions which occur daily on the exchanges and which are universally known and designated as speculations."

Plaintiff's business was of a like kind.

Plaintiff urges that if not a dealer as to all stocks held by it, it is entitled to be classed as a dealer as to some of the stocks held by it. I cannot agree. All of the transactions were of the same kind.

Plaintiff further contends that, if it is not to be considered a dealer in securities, still, under the "first in, first out" rule, it overstated its income in the return for the 1929 period and is entitled to recover an overpayment of $4,360.09. Unfortunately, it made no mention of this rule in its claim for refund. The sole ground for refund mentioned in the claim was that plaintiff was a dealer in securities and therefore entitled to inventory its securities at cost or market, which ever was lower. And from the evidence it appears that the only question discussed by plaintiff's attorney or considered by the Commissioner was whether plaintiff was a dealer. This claim, therefore, may not now be considered.

I am of the opinion that plaintiff is not entitled to recover and judgment should go for the Government.

