OPINION Kern, Judge: The respondent has determined that the stock of Northwestern National Life Insurance Co. sold by the syndicate described as the “second syndicate” in our Findings of Fact was not a capital asset under section 1221 and that the gain realized by petitioners as members of the second syndicate upon the syndicate’s sale of this stock was taxable as ordinary income pursuant to section 61. The relevant portion of section 1221 of the Internal Revenue Code of 1951 defines the term “capital asset” as “property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.” In support of his determination respondent contends that the second syndicate was a partnership, or a joint venture taxable as a partnership, which held the Northwestern stock primarily for sale to its customers in the ordinary course of its trade or business, or, in the alternative that the Northwestern stock held by the syndicate which was allocable to each member of the syndicate was held by each member primarily for sale to customers in the ordinary course of his own trade or business.[7] Respondent continues his argument by pointing-out that the second syndicate, of which petitioners were members, was instigated, formed, and controlled by James C. Bradford; that James C. Bradford had over 35 years of experience in the securities industry, had numerous connections and dealings with persons and companies in the life insurance industry, was the controlling partner of a securities firm which advertised itself as “Specialists in Life Insurance Stock,” and at all times intended for the syndicate to acquire and hold for at least 6 months the stock of Northwestern for the purpose of thereafter selling the stock at a profit to an organization of underwriters later to be formed who would in turn make an offering of the stock for sale to the general public. We find some difficulty in following certain phases of respondent’s argument.[8] With regard to the question of whether the Northwestern stock was held for sale by the second syndicate and the members thereof, including petitioners, respondent’s position is clear; the argument is that J. C. Bradford intended to sell this stock after it was acquired by the second syndicate and this intention of the manager of the syndicate communicated to the other members of the syndicate and acquiesced in by them must be considered to be the intent of petitioners. However with regard to the question of whether this Northwestern stock was property held by petitioners for sale to customers in the ordinary course of their trade or business, respondent’s argument is far from clear. By his citation of Estate of Freeland v. Commissioner, 393 F. 2d 573 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court,[9] and his underlined quotations from the opinion in that case, it might be surmised that respondent considered the taxpayers as indirectly participating in the sale made by the securities dealers who were members of the purchasing underwriters to their own customers after they had purchased the stock from petitioners’ syndicate. However, later in his brief, respondent categorically states that “The word ‘customers,’ as found in the context of this litigation, were [sic] the 104 underwriters who purchased the stock from the syndicate” and “The business purpose of the syndicate herein [of which petitioners were members] was to sell the shares of Northwestern to its customers, the underwriters.” This latter statement immediately follows a statement that “the Court has held that a joint venture for a single transaction may be engaged in a trade or business,” citing Morris W. Zack, 25 T.C. 676 (1955), affirmed per curiam 245 F. 2d 235, certiorari denied 355 U.S. 823.[10] Even though we assume arguendo that respondent is correct in his argument that the intent of J. C. Bradford, the manager of the syndicate, should be attributed to the syndicate, and to petitioners as members thereof, we are in disagreement with the second and crucial phase of respondent’s argument. In our opinion the sale of the Northwestern stock by the syndicate, of which petitioners were members, to the underwriters, of which Lehman Bros, acted as representative, did not constitute a sale or sales of property held by the taxpayers or any of them for sale to customers in the ordinary course of their trade or business. To the contrary it seems obvious to us that the sale to the group of underwriters represented by Lehman Bros, constituted the liquidation of investments made by the members of the selling syndicate who, in this respect, were traders in securities rather than dealers in or merchants of securities. Petitioners were clearly engaged in a speculation in stock for their own accounts and not in the retail sale of securities to customers as securities dealers. See Harry M. Adnee, 41 T.C. 40, 43 (1963). For discussions of the distinction between dealers and traders in securities with particular reference to “customers,” see Francis Shelton Farr, 44 B.T.A. 683, 690-691 (1941); and George B. Kemon, 16 T.C. 1026, 1032-1033 (1951). In the latter case we made the following statement: In determining whether a seller of securities sells to “customers,” the merchant analogy has heen employed. Schafer v. Helvering, 299 U.S. 171; Van Suetendael v. Commissioner, 152 F. 2d 654, affirming a Memorandum Opinion of this Court (Sept. 25, 1944) ; Leach Corp. v. Blacklidge, 23 F. Supp. 622; Warren Co. v. United States, 53 F. Supp. 578; Regulations 111, sec. 29.22(c)-5. Those who sell “to customers” are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. Cf. Schafer v. Helvering, supra; Securities-Allied Corp. v. Commissioner, 95 F. 2d 384, certiorari denied, 305 U.S. 617, affirming 36 B.T.A. 168; Commissioner v. Charavay, 79 F. 2d 406, affirming 29 B.T.A. 1255. Such sellers are known as “dealers.” Contrasted to “dealers’’ are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as “traders.” We have previously stated in our Findings of Fact that none of the petitioners in these consolidated cases is a securities dealer and that the second syndicate is not a securities dealer. We think the record clearly shows that the second syndicate’s major purpose was to hold the Northwestern stock for a period of time in order to realize capital gain from the excess of its market price over the option price, either anticipated or already existing.[11] In so purchasing, holding, and selling the Northwestern stock the second syndicate acted no differently from any other stock speculator trading on its own account. The congressional history and subsequent judicial interpretation of section 117 (b) of the Revenue Act of 1934 clearly show that that section and its successors were expressly designed to reach the very type of transaction involved in these cases. Despite respondent’s assertion to the contrary, there are no “unique or unusual facts” which would render these statutory provisions inapplicable to the petitioners in the stock transaction here at issue. The cases cited by respondent which do not involve sales of securities are clearly distinguishable from the instant proceedings. The only case cited to us by respondent in vyhich long-term capital gains treatment was denied on an alleged sale of a security held for investment for more than 6 months is Nielsen v. United States, 333 F. 2d 615 (C.A. 6, 1964), modifying 212 F. Supp. 801 (M.D. Tenn. 1962). In the Nielsen case the taxpayer, a general partner in the partnership of James C. Bradford & Co. which was a dealer and trader in securities and which is also involved in the instant proceedings, brought a suit for refund of taxes- paid with respect to his distributive share of partnership income. The Court of Appeals held, with respect to two different transactions involving stock of two different corporations, that certain of the stocks held by the partnership James C. Bradford & Co. in its own name for more than 6 months in compliance with the formal identification requirements of section 1236 were nevertheless held for sale to customers in the ordinary course of its business as a dealer in securities. From the facts as recited by the Court of Appeals and the District Court, it appears that in each of the transactions the partnership purchased the stock in question pursuant to an order of the customer and held the stock for the benefit of the customer for whom it had been purchased and not for the partnership’s own benefit, even though the stock was held in the partnership’s name. It is obvious that the instant cases are factually distinguishable from the Nielsen case. In the instant cases the record clearly shows that the second syndicate had no commitment from any prospective purchaser to buy the shares when it purchased them through Aragon from Nationwide and did not purchase them on behalf of or at the order of any customer. The record shows with utmost clarity that the second syndicate held the Northwestern stock solely for the benefit of its participants, who expected to realize a profit from the ultimate sale of the stock at a price in excess of the price paid for it by the syndicate and far in excess of the normal “mark-up” contemplated by securities dealers who “make a market” in over-the-counter stock. It is true that J. C., the manager of the syndicate, contemplated that the stock, or at least a large part of it, would be sold at a large profit, if possible, to a group of underwriters to be formed for the purpose of selling, in turn, the stock to the customers of the members of such group, and probably contemplated that Lehman Bros, would organize and represent the underwriters. However, under no reasonable theory can it be said that petitioners or any syndicate of which they were members acquired the stock here in question (or the option to purchase such stock) at the order or on behalf of Lehman Bros, or any underwriting group formed by it or of any other “customer.” Thus the Nielsen case has no relevance to the question before us. We hold that the Northwestern stock held and sold by or on behalf of petitioners through the second syndicate was a capital asset, and that the sale of some of this stock by the second syndicate at a price in excess of its cost basis after being held for more than 6 months produced a long-term capital gain for the second syndicate’s participants, including petitioners. Mirro-Dynamics Corp. v. United States, 374 F. 2d 14 (C.A. 9, 1967). None of the petitioners involved in the cases before us were members of the underwriting group which purchased the Northwestern stock. The fact that members of the underwriting group were dealers in securities and the fact that the ultimate sales of the Northwestern stock were made by them to their own customers are in no way relevant to the question of whether the Northwestern stock, or any option in connection therewith, constituted property held by the petitioners for sale to their customers in the ordinary course of their trade or business. Decisions will he entered for the petitioners. No issue has been raised by either party in these proceedings as to whether the first syndicate was a parnership for tax purposes or as to the tax treatment of the sale by the first syndicate of its option to purchase stock of Northwestern. “Respondent’s Request for Findings of Fact” as set out in his “brief” filed in these cases covers 147 pages. To a large extent it consists of unedited quotations from the over-voluminous documentary evidence. Respondent’s argument tends to become obscured by the undiscriminating recitation of oral and written testimony. In that case the basic finding was that taxpayer partners in a real estate venture “would seek constantly to construct vehicles for development, in which they would probably participate in one form or another, in order to be in a position to sell the acreage involved in slices of varying sizes as promptly as possible” — and hence that there was an indirect participation by taxpayers in sales and development activities. In this case, the purchase by the joint venture of the property later sold (hundreds of gun hoists) was a single transaction. However, the property was sold in three transactions after being offered for sale to the general public and after strenuous sales activities by certain members of the venture. When the second syndicate purchased the Northwestern stock, it did so at a price below the stock’s then-current market price.