Lester R. **ACKERMAN** and wife, Edna Del Ackerman, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 20511.

United States Court of Appeals Fifth Circuit.

July 28, 1964.

Rehearing Denied Aug. 26, 1964.

---

Wright Matthews, Robert K. Sands, Dallas, Tex., for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Earl J. Silbert, J. Edward Shillingburg, Attys., Dept. of Justice, Washington, D. C., Barefoot Sanders, Jr., U. S. Atty., Dallas, Tex., for appellee, Martha Joe Stroud, Asst. U. S. Atty., of counsel.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

This is an appeal from a judgment of the District Court for the Northern District of Texas that taxpayer [1] take nothing in his suit for refund. The years 1956–1959 inclusive are involved. Ackerman v. United States (D.C.N.D.Tex. 1963) 215 F.Supp. 867. The essential question is whether the taxpayer was holding certain real property, the proceeds from the sale of which are here involved, "primarily for sale to customers in the ordinary course of his trade or business" pursuant to § 1221 of the Internal Revenue Code of 1954.[2] This oft-litigated question is complicated by

---

1. Lester Ackerman and his wife, Edna Del, are both appellants; but since he was the active participant in the transactions involved, he alone will be referred to as taxpayer.

2. Pertinent provisions of § 1221 are:
   "SEC. 1221. CAPITAL ASSET DEFINED.
   For purposes of this subtitle, the term 'capital asset' means property

the circuitous route which the title to the property involved has followed.

On June 17, 1954, taxpayer purchased from Lee Ackerman Enterprises, an Arizona Corporation wholly owned by Lee Ackerman, taxpayer's brother who was an Arizona real estate developer, an undivided one-fourth interest in approximately 4,280 acres of desert land located about 16 miles north of Phoenix, Arizona, which was known as the Sam Joy Ranch. A one-fourth undivided interest was also conveyed by the same corporation to each of the following: (1) Ackerman & Rich, Inc., Realty & Development, owned by taxpayer's brother and another; (2) Lorenz and Joan Anderman; (3) Jessie, Mildred and Norman Alpert.[3] Two months after buying the property (August 17, 1954), taxpayer at the request of his brother, obtained a disclaimer deed from his wife "to facilitate any transaction that might occur." Sometime prior to May 11, 1955, less than eleven months after purchasing the prop-

erty, taxpayer and the other owners "decided to hold this property for sale to customers."[4] On May 11, 1955, Desert Hills Development Company, Inc. (Desert Hills) was formed for the purpose of improving and selling the property. Taxpayer and the other owners of the property owned 18 of the 24 shares [5] of stock in Desert Hills, and the affairs of the corporation were handled largely by taxpayer's brother, who testified that he had developed over two million acres of property in his career.

Taxpayer and the other owners of the property conveyed title to a trust company to hold as trustee. The record shows that the purpose of this trust was to expedite the subdivision of the property. On September 1, 1955, a one year option was then given to Desert Hills to purchase the land for $150.00 an acre. On October 7, 1955, slightly over one month later and approximately eleven months before the $150.00 option was to expire, a second option agreement,

held by the taxpayer (whether or not connected with his trade or business), but does not include—
(1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
* * * * *
(26 U.S.C. 1958 ed., Sec. 1221.)"

3. Lee Ackerman Enterprises purchased the Sam Joy Ranch for $65,000.00, of which $3,000.00 was paid as earnest money, $20,000.00 upon closing of escrow agreement, and a note of $42,000.00 was executed for the balance and was secured by a mortgage. All conveyances were made on June 17, 1954. All parties resided in Arizona except taxpayer who resided in Dallas, Texas.

4. See testimony on p. 9 infra.

5. While it is clear that the owners of the Sam Joy Ranch owned well over 50% of the stock in Desert Hills, the record indicates some confusion as to whether they owned 15 or 18 of the 24 shares.
    The taxpayer has filed as a brief, "Appellant's Oral Argument". Under the sub-heading, "Criticism of Government's Brief," the taxpayer states:

"The Government on page 21 of its brief admits that there were 9 shares of the 24 shares of Desert Hills not owned by owners of the Sam Joy Ranch. This is not correct."
The Government brief does assert that 15 of the 24 shares were owned by owners of the Sam Joy Ranch. At another place in the above mentioned document filed by taxpayer, the following appears:
"The 24 shares of common stock of Desert Hills were issued and owned as follows:

| Stockholders | No. of Shares Owned |
|---|---|
| Harold H. Alpert | 3 |
| Dr. Lorenz Anderman | 6 |
| Ackerman & Rich, Inc., Realty & Development | 6 |
| Kiva Investment Co. | 3 |
| Albert A. Horwitch | 3 |
| Lester Ackerman | 3 |
| | 24 |

It will thus be seen that there were two stockholders in Desert Hills who owned no interest in the Sam Joy Ranch; namely, Harold H. Alpert, who owned 3 shares of Desert Hills, and Albert A. Horwitch, who owned 3 shares. Thus, there was a 25% interest in Desert Hills which had no interest in the Sam Joy Ranch."

which superseded the first one, was given to Desert Hills to purchase the same land for $200.00 per acre. The two option agreements mentioned were introduced in evidence by the Government. Except for the increase in price of $50.00 per acre, they are identical. Still a third option was executed on October 9, 1956, substantially the same as the other two, with the exception that the option price was increased again, this time from $200.00 to $400.00 per acre. A second trust was set up to facilitate the conveyancing under the option and the trustee was directed by taxpayer and the other owners to take instructions relative thereto from Lee Ackerman, taxpayer's brother. No lots were ever sold at the cheaper price of $150.00 per acre, although the first option ran for a year. Of the 3,150 acres sold during the three years 1955–57, 2,870 acres were sold at $200.00 per acre and 280 acres at $400.00 per acre. When asked why Desert Hills had so willingly given up $50.00 per acre, taxpayer answered, "I don't know the answer to that, * * *" Desert Hills was capitalized with $2,400.00, but shortly thereafter obtained loans of $50,-000.00 and $25,000.00 from the trust company. The taxpayer and the other owners subordinated their rights as beneficiaries under the trust as security for these loans to Desert Hills.

Beginning in October of 1955, the property was divided into 10 acre lots, stakes were set out, lots were numbered and identified, bladed roads were constructed, and a gatehouse was built. Desert Hills notified brokers in Phoenix that all sales would be made through independent brokers working on a 10%

commission basis. There is some evidence that selling activity began and sales were made during "early summer" in 1955. At any rate, 330 acres were sold in 1955; 2,660 were sold in 1956; and 160 were sold in 1957. Desert Hills never took title to any of the property, but instead would direct the trustee, through taxpayer's brother, to convey directly to the ultimate purchaser. The record is silent as to the price received by Desert Hills, but no dividends were ever paid. The trustee would divide the receipts among taxpayer and the other owners. Against this record, the taxpayer argues that the trial court was clearly in error in finding that he held the property in question primarily for sale to customers, and in refusing to give credence to his self-serving declaration that he acquired the property as a long term investment with no expectation of selling it for twenty to twenty-five years.

■■ At the outset, we must answer taxpayer's contentions that since he is in the warehousing business, he cannot be subject to the statutory exclusion.[6] Numerous cases have held that a taxpayer can be in several businesses for tax purposes at one time. Thompson v. C. I. R., (5 Cir. 1963) 322 F.2d 122; Mathews v. Commissioner, (6 Cir. 1963) 317 F.2d 360.[7]

■ We next consider taxpayer's contention that the property was bought to be held as an investment over a long period of years with no purpose to hold it for sale to customers. Even if it were undisputed and unquestioned that taxpayer *acquired* the property as an investment, the statute excludes from capital

6. Taxpayer owned about two-thirds of the stock of City Delivery Service Co., Inc., which operated the Empire Terminal Warehouse in Dallas, Texas. He had been an officer of the company since 1950, and spent approximately 100% of his time operating the company warehouse.

7. "* * * It is indeed difficult for a layman to understand how a full-time, practicing physician can also be engaged in the holding of property primarily for

sale to customers in the ordinary course of his trade or business. But that is the law, established by all the controlling adjudications of the federal courts. That a different measure of taxation should apply to securities held for more than a six-months' period, and to real estate held for the same length of time, may, in many cases, and especially in this case, seem unfair to taxpayers. But that is the way in which the statute has been uniformly construed by the courts."

gains treatment property *held* for sale to customers. In Bauschard v. C. I. R., (6 Cir. 1960) 279 F.2d 115, a case very close in point, the Sixth Circuit held that the lower court's finding of (1) *acquisition* of the property for the purpose of protecting the community and surrounding property; and (2) a subsequent *holding* of the property for sale to customers, was not inconsistent. In Bauschard, taxpayer acquired the property in order to prevent the erection of a project on the property which would have an undesirable influence on the surrounding area.[8] Title was taken in a trustee. A corporation was formed for the purpose of subdividing and selling the lots. Options were given with a specified price to be paid taxpayer on the sale of each lot. Title was transferred directly from the trustee to the purchaser. The Tax Court found that the property was *held* primarily for sale to customers and that the proceeds to taxpayer were ordinary income. The Sixth Circuit affirmed, stating that:

"It is well settled that the question of whether property sold by a taxpayer at a profit was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, within the meaning of the statute, is essentially a question of fact. [citing cases]

"Necessarily, each case turns upon its own particular facts; no one circumstance or factor is controlling. Friend v. Commissioner, 10 Cir., 198 F.2d 285, 287, 46 A.L.R.2d 761; Kaltreider v. Commissioner, 3 Cir., 255 F.2d 833, 838; Gudgel v. Commissioner, 6 Cir., 273 F.2d 206, 210; Winnick v. Commissioner, 6 Cir., 199 F.2d 374. These cases give the

major factors to which consideration is given, and it is unnecessary to restate them here."

See also Burgher v. Campbell, (5 Cir. 1957) 244 F.2d 863; and Kaltreider v. C. I. R., (3 Cir. 1959) 255 F.2d 833.

More recently, we have recognized the same rule in our own Circuit in the case of Thompson v. C. I. R., (5 Cir. 1963), 322 F.2d 122, in which Judge Brown stated:

"But what was once an investment, or what may start out as a liquidation of an investment, may become something else. The Tax Court was eminently justified in concluding that this took place here. It was a regular part of the trade or business of Taxpayer to sell these lots to any and all comers who would meet his price. From 1944 on when the sales commenced, there is no evidence that he thereafter held the lots for any purpose other than the sale to prospective purchasers."

Several cases have been cited by the taxpayer as lending support to his argument. Rather than distinguish each of them, we reiterate what was said in Thompson:

"In this prolific field, it would be bootless to attempt a case-by-case distinction. It would be foreboding and unrewarding. We described this process in these words. 'We are aware of the decisions holding that various factors here present did not require a determination that property was held primarily for sale to customers in the ordinary course of trade or business. But each case must be decided on its own peculiar facts. * * * Specific factors, or

8. The following is from taxpayer's brief: "Desert Hills was organized because there were a number of parcels of property in the particular area, including the Sam Joy Ranch and three or four other properties lying to the east of the Sam Joy Ranch, and Lee Ackerman and the other organizers of Desert Hills felt that if this group of land could be optioned or purchased by Desert Hills a develop- ment could be made out of the land. After Desert Hills was organized it offered to take over all of the properties in the area of the Sam Joy Ranch with the idea in mind that if Desert Hills could, by purchase or option, tie up the various parcels in and around the Sam Joy Ranch and if Desert Hills went into a development program it would not have any competition in the area."

combinations of them are not necessarily controlling.' Wood v. Commissioner, 5 Cir., 1960, 276 F.2d 586, 590.

"We think it fraught with less hazards for us to emphasize affirmatively the things we regard as significant. * * * "

The taxpayer himself testified that he and the other owners had decided to hold the property for sale to customers even prior to the creation of the Desert Hills Corporation:

"Q. All right, Your Honor. Now, can you tell me when either your group or the corporation decided to hold this property for sale to customers?

"A. Exactly when?

"Q. Yes.

"A. No, I don't believe I can.

"Q. Was it at the time the corporation was formed?

"A. *I think it was prior to the time the corporation was formed.* (emphasis added)

"Q. Prior to the time the corporation was formed, the land was to be held for sale to customers, as I interpret your interpretation of this, it was a corporation who was to do the selling?

"A. That is correct.

"Q. Were they going to act at all in your behalf?

"A. Who?

"Q. The corporation.

"A. The corporation was going to act in my behalf?

"Q. Yes.

"A. For the sale of property? I don't understand the question exactly, but I know the corporation was planning to sell the property and this was to my interest as a stockholder, yes."

The taxpayer further testified that Desert Hills was formed for the purpose of subdividing and selling the property for him and the other owners, (one of whom was admittedly a real estate developer):

"Q. On this date, one after after (sic) you purchased this property, as I understand your testimony you were going to have the property sold off through or by Desert Hills?

"A. They were going to do the selling of the property.

"Q. It was still your property, wasn't it? Did you take title back to this property?

"A. I don't know.

"Q. Were you the first beneficiaries of this property?

"A. That is what it says.

"Q. Didn't anybody explain to you the way this transaction would work?

"A. No, sir. That was Arizona law out there, and I didn't know anything about it.

"Q. Let us find out what your purpose was. What were you going to do with this property?

"A. Desert Hills had been formed at that time, and we were planning on having them sell the property in addition to other property.

"Q. Eleven months after you purchased this property, you people formed a corporation?

"A. Yes.

"Q. The purpose of the corporation was to take some of this Sam Joy property and improve the property and sell it?

"A. Yes."

* * * * * *

"Q. Now, the evidence in this case shows that the Desert Hills acquired an option on the Sam Joy Ranch from you and the other owners on September 1st. Can you tell me why you gave that option? Why you participated in giving that option on September 1st to Desert Hills Development Company?

"A. Because Desert Hills was going to develop the property."

The essential element in the receipt of a capital gain is a *sale* or *ex-*

*change* [9] of a capital asset. For there to be a sale or exchange there must be a receipt of something valuable. Without getting into the question of whether taxpayer received something valuable at the time Desert Hills purchased the option, or only at the later period when taxpayer received money from the trustee; that is to say, giving taxpayer the benefit of whichever time would best serve his purpose, the record is clear that at either time taxpayer held the property for sale to customers.

One of the chief controverted issues in this case concerns the relationship and dealings between Desert Hills and the owners of Sam Joy Ranch. The Government contends that the evidence convincingly establishes that the four owners of the ranch controlled Desert Hills. It points to the evidence that Lee Ackerman, the taxpayer's brother, was authorized to act for the four owners; that such owners controlled well over 50% of the stock in Desert Hills; that their interests were subordinated in connection with loans and mortgages; and that Desert Hills surrendered an option from such owners for $150.00 per acre in return for an option for $200.00 per acre. In these circumstances, asserts the Government, the contentions of the taxpayer that he sold the property in a single transaction to only one customer—Desert Hills—is without merit, because Desert Hills was acting in behalf of the taxpayer and his associates.

The taxpayer relies heavily upon the corporate structure of Desert Hills, and the fact that it is a separate entity. He repeatedly asserts that at all times it was independent, free, disconnected, and not subject to domination or control by the owners of the Ranch.[10]

\* \* \* \* \*

"Pursuant to the first, second and third options given to Desert Hills, if Desert Hills called for a conveyance of every acre of the Sam Joy Ranch at the then existing option price, the Phoenix Title and Trust Company was required to convey the property to Desert Hills at the option price."

\* \* \* \*

"The blocking of the land and its sale was done by Desert Hills, a corporate entity, pursuant to legally binding options."

\* \* \* \* \*

"Appellants submit that the record in this case discloses that Lester R. Ackerman did not acquire and hold his interest in the Sam Joy Ranch primarily for sale but acquired and held it as a long-term investment, that he had no customers of his own and has never been in the real estate business, and, in fact, sold his interest in the Sam Joy Ranch, pursuant to option agreements to Desert Hills in one transaction; that Desert Hills, in turn, sold the property through independent brokers, and the customers of the independent brokers were not the customers of Desert Hills or of Lester R. Ackerman."

\* \* \* \* \*

"The options and trust agreements gave Desert Hills, a separate corporate entity, the right to buy all or a part of the Sam Joy Ranch during

---

9. Haden, "Fundamentals of Federal Taxation", (1959):

"\* \* \* The capital gain sections of the Code apply only to gains from a sale or exchange of a capital asset. For this reason if the gain is from some other disposition of a capital asset, it is not treated as a capital gain. For this reason we must decide exactly what constitutes a sale or exchange. It would seem that for there to be a sale or exchange, the taxpayer must dispose of one 'gain source' and receive in its place another 'gain source'. If the 'gain source' received is money, the transaction is a sale; if something else, it is an exchange. This rule is stated in these words to call attention to the fact that if the thing received is merely evidence of the same basic proprietary interest, there has been no sale or exchange. For there to be a sale or exchange, there must be a disposition and a receipt of something."

10. The taxpayer's insistence with respect to the position occupied by Desert Hills is best illustrated by the following excerpts from the taxpayer's brief: "Desert Hills was organized because appellant's brother, Lee Ackerman, and the other organizers felt that if the Sam Joy Ranch and these other ranches could be optioned or purchased a development could be made out of all of these lands by Desert Hills."

■ We find it impossible to accept the contentions of the taxpayer as to the relationship which existed between the owners of Sam Joy Ranch and Desert Hills. The maneuverings which transpired between such owners and Desert Hills do not support the connotation of independence, or arm's length transactions. The record contains no explanation whatever as to why option No. 1 was superseded by option No. 2 at a time when the period of the first option had almost a year to run. The increase in the per acre price in option No. 2 was $50.00. Involved were over 4,200 acres. The net result of this single transaction, in which option No. 1 was replaced by option No. 2 within a period of about five weeks, was to give the owners of Sam Joy Ranch over $200,000 more for their land. On oral argument, this Court made pointed inquiry about the various

options and sought an explanation of the facts relating to the first and second options. No satisfactory explanation has been given. Both options recite a valid and identical consideration. As a matter of fact, all three options state the same consideration. The first option—the low price—was never exercised although the other two were exercised. In considering all of the circumstances of this case, the controlling stock ownership in Desert Hills by the owners of Sam Joy Ranch, the facts surrounding the options, and all other factors involved, we cannot reach the conclusion, strongly urged by the taxpayer, that Desert Hills was a separate, independent, uncontrolled, and free entity in its relationship and dealings with the taxpayer and his associates. Broughton v. Commissioner, (6 Cir., June 25, 1964), 333 F.2d 492.[11]

The judgment is affirmed.

the option period. After title to the Sam Joy Ranch passed to the trust and became subject to the option, appellant's interest in the property was legally out of his control."

\* \* \* \* \*

"The sales activity which took place was conducted by Desert Hills and by the independent brokers and appellant had no control over these brokers whatsoever or over Desert Hills. He was legally bound during the existence of the option to let Desert Hills take all or any part of the Sam Joy Ranch at the existing option price."

\* \* \* \* \*

"If appellant had any customer, his only customer was Desert Hills, who had a right to acquire all or a part of the Sam Joy Ranch pursuant to the several option agreements."

11. In Broughton, the court had occasion to assert:

"\* \* \* The gain from the sale of property which is excluded from the definition of capital assets is taxable as ordinary income. Thus, the initial issue for determination is whether the Tax Court was correct in holding that the lots held respectively for Mr. Broughton and Mrs. Broughton were held primarily for sale to customers in the ordinary course of their trade or business. This issue is essentially a factual one, the determination of which necessarily depends upon the

facts and circumstances in each particular case and no one fact or circumstance is controlling. Bauschard v. Commissioner, 279 F.2d 115 (C.C.A. 6, 1960). The factors which are usually applicable in making such a determination were summarized by this Court in Mathews v. Commissioner, 315 F.2d 101 (C.C.A.6, 1963). Among the factors there pointed out to be considered are (1) the purpose for which the property was acquired; (2) the purpose for which the property was held; (3) the improvements and their extent, which were made to the property by the taxpayer; (4) the frequency, number, and continuity of sales; (5) the extent and substantiality of the transaction; (6) the nature and extent of the business of the taxpayers; (7) the extent of advertising to promote sales, or the lack of such advertising; (8) the listing, if any, of the property for sale directly or through brokers. See also Kaltreider v. Commissioner, 255 F.2d 833 (C.C.A. 3, 1958) and Bauschard v. Commissioner, 279 F.2d 115 (C.C.A.6, 1960). "A factual determination by the Tax Court upon the issue now before this Court may not be set aside upon appeal unless it is clearly erroneous. United States v. United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; rehearing denied, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 \* \* \*.'"